**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

UNITED STATES OF AMERICA,

     v.

RODERICK ARRINGTON,

          Defendant.
_____

15-CR-33-A
**DECISION AND ORDER**

     This case is before the Court on Defendant Roderick Arrington's renewed motion for judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29. *See* Docket No. 265 (Def. Mtn.). The Defendant also moves to dismiss the superseding indictment for lack of subject-matter jurisdiction. For the reasons stated below, both motions are denied.

## BACKGROUND

     The Defendant was convicted on eight counts of a twelve-count redacted indictment. Specifically, the Defendant was convicted of (1) racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); (2) narcotics conspiracy, in violation of 21 U.S.C. § 846; (3) using or carrying a firearm during and in relation to the commission of, or possessing a firearm in furtherance of, Counts 1 and 2, in violation of 18 U.S.C. § 924(c)(1)(A)(i) and § 2; (4) murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1); (5) discharge of a firearm in furtherance of Count 4, in violation of 18 U.S.C. § 924(c)(1)(A)(iii); (6) discharge of a firearm causing death in furtherance of Count 4, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and § 924(j)(1); (7) attempted murder in aid of racketeering, in violation

of 18 U.S.C. § 1959(a)(5); and (8) discharge of a firearm in furtherance of Count 7, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).[1]

Over the course of a nine-day jury trial, the Government introduced over 100 exhibits and testimony from forty-one witnesses.[2] In brief, the evidence showed that the Defendant was a member of the Schuele Boys,[3] a drug-trafficking organization that operated on and around the area of Schuele Avenue, in Buffalo, New York. The evidence showed that co-defendants Aaron Hicks, Marcel Worthy, and Letorrance Travis operated a large-scale cocaine trafficking organization that purchased hundreds of kilograms of cocaine, as well as marijuana, from co-defendant Julio Contreras in south Texas.[4]

The evidence did not show that the Defendant personally distributed large quantities of narcotics during the time period that was the focus of the trial—that is, from late 2010 until late 2014.[5] The evidence did show, however, that the Defendant was, in the Government's words (Docket No. 275 at 11), the organization's "muscle." Specifically, the Government introduced overwhelming evidence that the Defendant murdered Quincy Balance, and attempted to murder Damon Hunter, after members of the Schuele Boys—

---

[1] The Defendant was acquitted on Counts 9, 10, 11, and 12, all of which concerned narcotics and a firearm that were found in the house where the Defendant was arrested.

[2] At the time this Decision and Order is being filed, neither party has ordered a copy of the trial transcript. Thus, this Decision and Order has been prepared based largely on the Court's trial notes. Where the Court quotes trial testimony in this Decision and Order, the Court Reporter has provided the Court with relevant excerpts of the trial transcript.

[3] There was no evidence that any member of the organization referred to the organization as the "Schuele Boys." The superseding indictment, however, referred to the organization as the "Schuele Boys," and for the sake of convenience, the Court does so as well.

[4] Defendants Worthy, Travis and Contreras pleaded guilty before trial. Defendant Hicks's trial was severed from Defendant Arrington's trial. *See* Docket No. 247.

[5] Jerome Grant testified that the Defendant sold marijuana in the early 2000s. Grant also testified that, on one occasion after he was released from prison in 2013, he bought an eight-ball of cocaine from the Defendant.

including the Defendant—came to believe that Balance and Hunter had murdered a Schuele Boys associate several days earlier. The Government also introduced evidence that the Defendant had offered to engage in a similar retaliatory murder after a Schuele Boys associate was robbed of $3,300 worth of marijuana.

**DISCUSSION**

### A. Standard for judgment of acquittal

Rule 29 imposes a heavy burden on a defendant challenging his conviction following a jury trial. A court may enter a judgment of acquittal "only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt. In applying these principles, [the Court] review[s] all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (quotation marks and citations omitted). In other words, Rule 29 requires that the Court give significant deference to a jury's findings as to "the weight of the evidence and the reasonable inferences to be drawn" from that evidence. *Id.* (quotation marks omitted). This means not only that the Court "must credit every inference that could have been drawn in the government's favor," but that, in assessing the sufficiency of the evidence, the Court "must view the evidence as a whole." *United States v. Applins*, 637 F.3d 59, 76 (2d Cir. 2011). At bottom, "where either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *Facen*, 812 F.3d at 286 (quotation marks and brackets omitted). Finally, when a defendant challenges his conviction on a conspiracy charge—as the Defendant does with regard to Counts 1 and

2—"deference to the jury's findings is especially important because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Wexler*, 522 F.3d 194, 207 (2d Cir. 2008) (quotation marks and ellipsis omitted).

## B. The Defendant's arguments for acquittal

The Defendant first renews his Rule 29 motion as to Count 1, which charged him with being a member of a racketeering conspiracy. The Defendant next renews his Rule 29 motion as to Counts 4 and 7, which charged him, respectively, with murder and attempted murder in aid of racketeering. Finally, the Defendant renews his Rule 29 motion as to Count 2, which charged him with being a member of a narcotics conspiracy. The Court addresses each Count in turn.[6]

### 1. Count 1 (Racketeering Conspiracy)

#### a. The existence of an enterprise

The Defendant first argues that the Government failed to introduce sufficient evidence to allow a reasonable jury to find that an "enterprise" existed, as that term is defined in the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961, *et seq.* Specifically, the Defendant argues that "[n]o one testified that there was an 'enterprise,' what the enterprise was, who was in fact a member, or what the objectives of the enterprise were." Def. Mtn. ¶ 5. *See also id.* ¶ 7 ("There was no distinct testimony of hierarchy, upward mobility or membership requirements. No one listed who they believed were the Members of the 'enterprise.'")

---

[6] The Defendant does not seek acquittal on Count 3. In addition, the Defendant does not expressly seek acquittal on Counts 5, 6, or 8, all of which charged him with violations of 18 U.S.C. § 924(c). However, because Counts 4 and 7 served as the predicate "crime[s] of violence" for Counts 5, 6, and 8, acquittal on Counts 4 and 7 would require acquittal on Counts 5, 6, and 8.

Count 1, however, did not charge the Defendant with a substantive RICO offense. It instead charged him with *conspiring* to participate in the affairs of an enterprise through a pattern of racketeering. Unlike a substantive RICO offense, the Government does not need to prove the existence of an "enterprise" to prove a RICO conspiracy. *See United States v. Applins*, 637 F.3d 59, 75 (2d Cir. 2011) ("We . . . conclude that *Salinas* [*v. United States*, 522 U.S. 52 (1997)] counsels that the establishment of an enterprise is not an element of the RICO conspiracy offense.") The Government must instead prove that the Defendant "intend[ed] to further an endeavor which, if completed, would satisfy all of the elements of a substantive" RICO offense. *Salinas*, 522 U.S. at 65.

The Defendant's enterprise-based arguments are relevant to Counts 4 and 7 (murder and attempted murder in aid of racketeering), both of which require the Government to prove the existence of an "enterprise." But because the Government did not need to prove that an "enterprise" existed to convict the Defendant of Count 1, the Defendant's motion for acquittal on that basis is denied.

### b. Racketeering activity

The Defendant next argues that he should be acquitted of Count 1 because there was insufficient evidence to show "a pattern of '[r]acketeering' on [his] part." Def. Mtn. ¶ 8. This argument misconstrues the nature of RICO conspiracy. It is well settled that, to convict a defendant of RICO conspiracy, "only an agreement to commit two or more predicate acts, *rather than the acts themselves*, need be proven." *United States v. Persico*, 832 F.2d 705, 713 (2d Cir. 1987) (emphasis added). "[I]n deciding whether a defendant is guilty of RICO conspiracy, the jury must consider the predicate acts charged against the defendant and his alleged co-conspirators to determine 'whether the charged

predicate acts were, or were intended to be, committed as part of that conspiracy.'" *United States v. Cain*, 671 F.3d 271, 291 (2d Cir. 2012) (quoting *United States v. Yannotti*, 541 F.3d 112, 129 n.11 (2d Cir. 2008)). "Indeed, to secure [the Defendant's] conviction for RICO conspiracy, the [G]overnment [is] not required to prove the *actual* commission of a single predicate act by [the Defendant] or by any other conspirator." *Yannotti*, 541 F.3d at 129.

Although it did not need to do so to secure a conviction on Count 1, the Government introduced overwhelming evidence that the Defendant personally committed one murder (Quincy Balance) and one attempted murder (Damon Hunter). Moreover, the Government introduced substantial evidence that the racketeering conspiracy was centered around a large-scale cocaine trafficking organization run by the Defendant's co-defendants. The circumstances surrounding each of these crimes, as described more fully below, were sufficient to allow a reasonable jury to conclude that the acts were, or were intended to be, committed as part of a racketeering conspiracy.

### c. The Defendant's membership in the conspiracy

The Defendant next argues that there was insufficient evidence to prove that he became a member of a RICO conspiracy. Def. Mtn. ¶ 8.

"To be guilty of conspiracy, there must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Snow*, 462 F.3d 55, 68 (2d Cir. 2006) (quotation marks omitted). "[T]he government need not prove that a conspirator-defendant agreed with every other conspirator, or knew all the other conspirators, or had full knowledge of all the details of

the conspiracy." *United States v. Rastelli*, 870 F.2d 822, 828 (2d Cir. 1989). This is true even in a RICO conspiracy: The Government must prove "no more" than that the defendant "kn[e]w the general nature of the enterprise and that the enterprise extends beyond his individual role." *Id.* (citations omitted). *See also United States v. Zichettello*, 208 F.3d 72, 99 (2d Cir. 2000) (same).

The evidence introduced at trial was sufficient for a reasonable jury to find that the Defendant knew of, and knowingly joined, a conspiracy to participate in the affairs of an enterprise through a pattern of racketeering. To be sure, the evidence did not show that the Defendant was intimately involved in every aspect of the conspiracy. The evidence did not show, for instance, that the Defendant personally participated in the conspiracy's core racketeering activity of cocaine distribution. But a reasonable jury could have found that the Defendant knew of the "general nature" of the conspiracy, knew that the conspiracy extended beyond his role, and knowingly joined the conspiracy.

For instance, the Government introduced evidence that the Defendant knew that other Schuele Boys associates were involved in the dangerous business of selling large volumes of narcotics: the Defendant was present when his co-conspirators broke down a forty-pound bale of marijuana, and he offered another Schuele Boys associate a "family price" to retaliate against the person who had robbed the associate of $3,300 worth of marijuana. Likewise, Spencer Rogers testified that the Defendant often spent time at a house in Schuele Boys territory that was owned by Hicks, and out of which a Schuele Boys associate sold cocaine and marijuana.[7]

---

[7] In addition, Jerome Grant testified that he purchased an eight-ball of cocaine from the Defendant after Grant was released from prison in 2013. The record does not show, however, the source of the Defendant's cocaine.

The Defendant's own conduct, however, was the strongest evidence of his membership in the conspiracy. The Government introduced overwhelming evidence that the Defendant murdered Quincy Balance, and attempted to murder Damon Hunter, after the Defendant and his co-defendants came to believe that Balance and Hunter had murdered Matt,[8] a friend of Hicks, who was selling cocaine and marijuana out of a house owned by Hicks in Schuele Boys' territory. Demario James testified that, at Matt's wake, the Defendant, Hicks, Worthy, and James Robbs, discussed "catch[ing] up with . . . the guy that killed Matt." They did so four days later, when the Defendant murdered Balance and shot at Hunter. Indeed, another witness, Jessica Kazukiewicz, confirmed that Balance's murder was in retaliation for Matt's murder: Kazukiewicz, who was sitting in Balance's car before the Defendant shot Balance, heard Balance and Hicks "talking about a shooting that happened on Carl Street"—that is, the location where Matt was murdered—and heard Balance state that he "didn't kill the man." The Defendant then murdered Balance and shot at Hunter. This evidence was sufficient for a reasonable jury to conclude that the Defendant agreed to murder Balance and attempted to murder Hunter because he believed that they had murdered Matt—a person, the Defendant knew, who sold drugs out of a house that was located in Schuele Boys territory and owned by Hicks. In other words, the evidence surrounding Balance's murder and Hunter's attempted murder was sufficient for a reasonable jury to conclude (1) that the Defendant knew of the general contours of the Schuele Boys' racketeering activity, and (2) that he knowingly joined their conspiracy.

---

[8] Matt's real name was Walter Davison.

The Government also introduced other evidence from which a reasonable jury could have found that the Defendant knowingly joined the conspiracy and that he knew, at the very least, the general contours of the conspiracy's racketeering activity. For instance, the Government introduced two music videos produced by G.O.N.E. Ent., a record label incorporated by Hicks. The Defendant appears in both of the music videos that were introduced at trial. The first video, "Front Door," repeatedly shows the Defendant—together with Hicks, Travis, Worthy, and many others—on and around Schuele Avenue, as the video's rapper, Serious Black, describes the drug trafficking business.[9]

The second video, "Dinner Table," begins by showing the Defendant standing next to Black as Black tells the camera the extent of the Schuele Boys' territory. *See* Gov't Ex. 24T ("We go from Schuele all the way down motherfuckin' Courtland.") The video then shows the Defendant, together with Hicks, Travis, and many others, drinking expensive champagne at a high-end steakhouse as a platter full of cash is brought to the table. As with "Front Door," the lyrics to "Dinner Table" describe the money that can be made from drug trafficking: The song's chorus repeats, "We call the trap the dinner table/Eating trap the dinner table." *Id.* One witness, Jerome Grant, testified that a "trap" is a location where drugs are sold, and that, to "call the trap the dinner table" referred to one's ability to "eat"—that is, make a large amount of money—from selling drugs. Throughout "Dinner Table," the Defendant is seen sitting at a dinner table next to Hicks—

---

[9] For instance, the lyrics to "Front Door" advise "[n]ever ever use the front door/The trap door built on the side/Clientele in the back/Keep your work close by/And you gotta stay strappin'/Don't be talking on the phone/It's too hot for all of that." Gov't Ex. 23T. Later, the lyrics state "36 in a brick, 16 in a pound/You take it to the trap, you break it all down."

that is, the person who was responsible for first arranging the Schuele Boys' large-volume cocaine purchases.

Finally, as further evidence of the Defendant's membership in the conspiracy, the Government introduced a letter and exculpatory affidavit that the Defendant attempted to give to his girlfriend while he was in the Niagara County Jail following his arrest in this case. The letter asks "[h]ow its going with the Names, How many people we got so far?" Gov't Ex. 14A at 1. The letter then states:

> Tell Tory, Torrance Brother and His mom we need there Help too on this. Give them Like 10 copies so they can get shit gong to. Tell fat Stacks, Beans, OP, Jimmy to sign That paper too. My girl just gave you Affidavits Make sure you go with these Niggas to get them Notarized. I need these Back ASAP. I need you to give Tori one, fat stacks one, Beans one, Op one, Jimmy one. Tell them Niggas this shit gone set Niggas free, And gone Let me know who setting us up with the feds.

The letter concludes: "Make sure this Letter is gone→Tear up Now." The Government introduced evidence showing that each of the people referenced in this letter were members of the Schuele Boys.

The evidence described above—viewed, as it must be, in its entirety and in the light most favorable to the Government—is sufficient for a reasonable jury to conclude that the Defendant knew, at the very least, the general contours of the Schuele Boys' racketeering activity, even if the evidence did not show that the Defendant was intimately involved in the details of his co-defendants' cocaine trafficking. *See Applins*, 637 F.3d at 75 ("[T]o be convicted as a conspirator under RICO, one must be shown to have possessed knowledge of only the general contours of the conspiracy") (quotation marks omitted). And the evidence—in particular, the shooting and the music videos—provided sufficient evidence for a reasonable jury to conclude that the Defendant knowingly joined

the conspiracy: The shooting showed that the Defendant performed "work" on the Schuele Boys' behalf, while the videos repeatedly showed the Defendant, together with other members of the Schuele Boys, as a Schuele Boys associate raps about engaging in, and making money from, drug trafficking.

To be sure, the evidence of the Defendant's membership in the conspiracy was more circumstantial than the evidence as to some of the conspiracy's core members, such as Hicks, Worthy, and Travis. But when reviewing the sufficiency of the evidence of a person's membership in a conspiracy, it is "especially important" to "view[] the evidence in conjunction," rather than in isolation, because a conspiracy must often be proven through circumstantial evidence. *United States v. Casmento*, 887 F.2d 1141, 1156 (2d Cir. 1989). The Government easily proved the existence of a conspiracy among Hicks, Worthy, and Travis. As a result, "the evidence sufficient to link" the Defendant "to [the conspiracy] need not be overwhelming," so long as the evidence showed the Defendant's knowledge of the conspiracy's objective and his agreement to join the conspiracy. *Id.* The evidence described above, taken together, was sufficient for a reasonable jury to conclude (1) that the Defendant "agreed to participate in the broader criminal conspiracy," and (2) that the Defendant knew of that conspiracy's general contours. *United States v. Yannotti*, 541 F.3d 112, 122 (2d Cir. 2008).

The Defendant responds that there was insufficient evidence to show that he was a member of the conspiracy because "[h]e was proven to be either out of town or in prison during many of the events of the trial, and no continued communication or role while he was gone was established." Def. Mtn. ¶ 8. This argument is beside the point. Although the Defendant was incarcerated for periods of time during the conspiracy's operation, he

was *not* incarcerated from March 2011 through February 2013, and from May 2013 until his arrest in this case in October 2014.

In other words, the Defendant was not in jail for a significant period of time during the conspiracy's operation. And the time the Defendant was out of jail coincided with significant moments in the life of the conspiracy: The Schuele Boys began shipping cocaine to Buffalo from south Texas in November 2010, just four months before the Defendant was released from jail, and their trafficking continued for much of the period of time when the Defendant was out of jail. Moreover, the Defendant was, of course, out of jail when he murdered Balance and attempted to murder Hunter, and he was obviously out of jail when he appeared in several music videos that flaunted the Schuele Boys' drug-trafficking success. Thus, the Defendant's time in jail has no bearing on whether there was sufficient evidence for a reasonable jury to conclude that he was a member of a conspiracy to participate in the affairs of an enterprise through a pattern of racketeering activity.

### 2. Count 4 (Murder in Aid of Racketeering) and Count 7 (Attempted Murder in Aid of Racketeering)

The Defendant also moves for judgment of acquittal on Counts 4 and 7. Those Counts charged him, respectively, with murder in aid of racketeering, based on the murder of Quincy Balance; and attempted murder in aid of racketeering, based on the attempted murder of Damon Hunter.

The Defendant challenges several elements of his convictions on Counts 4 and 7. First, as with Count 1, the Defendant argues that the Government did not introduce sufficient evidence of an "enterprise." He next argues that the Government failed to introduce sufficient evidence showing that the "enterprise was engaged in racketeering";

he asserts that he "had [no] position in the enterprise"; and he claims that the evidence does not show that his "general purpose" in committing the murder and attempted murder "was to maintain or increase his position in the enterprise." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992) (listing elements of § 1959 violation).[10] The Court addresses each argument in turn.

### a. The existence of an enterprise

"There is no restriction upon the associations embraced by the definition" of the term "enterprise." *United States v. Turkette*, 452 U.S. 576, 580-81 (1981). *See* 18 U.S.C. § 1959(b)(2) (using nearly identical definition of "enterprise" as in RICO statute). In its most basic form, an association-in-fact enterprise—that is, the type of enterprise alleged in this case—is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 580-81 (1981). "Such an enterprise . . . 'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *Boyle v. United States*, 556 U.S. 938, 944-45 (2009) (quoting *Turkette*, 452 U.S. at 583). It is well-settled that "an association-in-fact enterprise must have a structure"—that is, the enterprise must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946.

---

[10] To convict a person of violating 18 U.S.C. § 1959, the Government must also prove "that the defendant committed the alleged crime[s] of violence." *Id.* In this case, those crimes were the murder of Quincy Balance and the attempted murder of Damon Hunter. The Defendant does not argue that the evidence was insufficient for a reasonable jury to find that he murdered Quincy Balance and attempted to murder Damon Hunter.

The concept of an association-in-fact enterprise, however, is "not . . . rigid." *United States v. Pierce*, 785 F.3d 832, 838 (2d Cir. 2015). As an initial matter, the evidence of an enterprise's racketeering activity may also help define the enterprise's structure. *See Boyle*, 556 U.S. at 947 ("We recognized in *Turkette* that the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'") (quoting 452 U.S. at 583). And an association-in-fact enterprise need not have business-like attributes, nor must it contain certain features that might be associated with the popular understanding of a "gang." The Defendant makes a number of arguments along these lines, but the Supreme Court has succinctly rejected them:

> [A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by period of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashion, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Id.* at 948.

With these principles in mind, the evidence introduced at trial was more than sufficient for a reasonable jury to find that an "enterprise" existed. The Defendant is correct that the evidence did not show that the Schuele Boys had any formal structure; it

did not, for instance, have a defined hierarchy or specifically-defined roles. But the enterprise's structure in this case was more readily "proven by what [the enterprise] d[id], rather than by abstract analysis of its structure." *United States v. Coonan*, 938 F.2d 1553, 1559 (2d Cir. 1991) (quotation marks and emphasis omitted). *See also Boyle*, 556 U.S. at 947. The evidence showed that the Defendant's co-defendants—Hicks, Travis, Worthy and Contreras—worked together for at least one year to ship hundreds of kilograms of cocaine from south Texas to Buffalo, which they then sold to others for ultimate retail sale. This core group, in other words, "joined in the shared purpose of selling drugs and promoting such sales," *United States v. Burden*, 600 F.3d 204, 25 (2d Cir. 2010), and they did so in and around a relatively defined territory that served as their "base of operations." *Pierce*, 785 F.3d at 838. This was sufficient for a reasonable jury to conclude that the Schuele Boys was an "enterprise."

### b. Racketeering activity

To convict the Defendant of murder and attempted murder in aid of racketeering, the Government must prove that the "enterprise" "engaged in racketeering activity," as that term is defined in RICO. *See* 18 U.S.C. § 1959(a); *id.* § 1959(b)(1); *id.* § 1961(1). The Defendant argues that, "to show a pattern of 'racketeering' on the accused's part, there must be proof that the defendant was involved in two . . . acts of racketeering." Def. Mtn. ¶ 8.

The statute charged in Counts 4 and 7, however—18 U.S.C. § 1959—"does not require a 'pattern' of racketeering activity," as a substantive RICO charge does; the statute instead requires only that the enterprise be engaged in "racketeering activity." *United States v. Soler*, No. 94 Cr. 533 TPG, 1996 WL 734894, at *1 (S.D.N.Y. Dec. 24,

1996). *See also United States v. McAuley*, 629 F. App'x 74, 76 (2d Cir. 2015) (observing that 18 U.S.C. § 1959, "unlike RICO, does not require proof of a pattern of racketeering activity"). The Government introduced overwhelming evidence that the Schuele Boys engaged in multiple acts of narcotics trafficking, murder, and attempted murder, any one of which is an example of "racketeering activity." *See* 18 U.S.C. 1961(1).

### c. The Defendant's position in the enterprise

The Defendant next argues that there was insufficient evidence to show that he was a member of the Schuele Boys. Def. Mtn. ¶ 8. To prove a violation of 18 U.S.C. § 1959, the Government must prove "that the defendant in question had a position in the enterprise." *Concepcion*, 983 F.2d at 381. To have a "position" within an enterprise, a person need not have a high-ranking role, nor must he control any part of the enterprise's criminal activity; a person who simply "commit[s] crimes under the auspices" of other members of an enterprise has a "position" as much as someone who manages the enterprise's criminal activity. *See United States v. Brady*, 26 F.3d 282, 285, 289-91 (2d Cir. 1994) (rejecting argument that, because defendant was an "associate" of organized crime family, rather than a "made member," he could not be convicted of violating § 1959).

The Government introduced sufficient evidence for a reasonable jury to conclude that the Defendant had a "position" in the Schuele Boys. As noted with regard to Count 1, the Government introduced evidence that the Defendant appeared in two music videos, together with several members of the Schuele Boys. The Government also introduced a letter written by the Defendant in which he requested that exculpatory affidavits be circulated to other Schuele Boys members on his behalf; as Worthy testified with regard to a similar exculpatory affidavit, these affidavits were a way in which he, together with

the Defendant, Hicks, and Travis, "look[ed] out for each other," in "the same way [they] [did] on the streets." Finally, the Defendant offered to, and did, commit acts of violence on behalf of Schuele Boys associates. In particular, Quincy Balance's murder—which, the evidence showed, was done in retaliation for the murder of a Schuele Boys associate—is strong evidence that the Defendant had a position as an "enforcer" within the Schuele Boys. A reasonable jury could infer that the Defendant was chosen (or volunteered) to murder Balance because he was trusted, by virtue of his membership in the enterprise, to do the job.

As the Court noted with regard to Count 1, the evidence of the Defendant's position within the Schuele Boys is largely circumstantial. But particularly in the case of an association-in-fact enterprise, such as this one, it is unlikely that a properly-proven enterprise will have a membership list, or that each member's role in the enterprise will be defined with precision. Thus, although the evidence of the Defendant's position in the enterprise was circumstantial, that evidence—when viewed as a whole and in the light most favorable to the Government—was sufficient for a reasonable jury to conclude that the Defendant had a position in the enterprise.

### d. The "purpose for" the murder and the attempted murder

Finally, the Defendant argues that he should be acquitted on Counts 4 and 7 because there was insufficient evidence for a reasonable jury to conclude that the Defendant murdered Quincy Balance and attempted to murder Damon Hunter "for the purpose of gaining entrance to or maintaining or increasing position in" an enterprise. 18 U.S.C. § 1959(a). *See* Def. Mtn. ¶ 15 ("[E]ven if the Court accepts the Jury's assessment that Mr. Arrington was responsible for the death of Mr. Balance, the killing was only proven

to be a 'retribution' killing, because a friend was killed.  No one testified in any fashion that Mr. Balance was killed to further any component of an 'enterprise.'")

The Second Circuit has rejected "the notion that the 'for the purpose of' element" in 18 U.S.C. § 1959 "must be the defendant's sole or principle motive." *United States v. Burden*, 600 F.3d 204, 220 (2d Cir. 2010).  Rather, § 1959's "motive requirement [is] satisfied if the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992).

The evidence introduced at trial was sufficient for a reasonable jury to conclude that, when the Defendant murdered Quincy Balance and shot at Damon Hunter, he did so because "he knew it was expected of him by reason of his membership" or that "he committed [the crimes of violence] in furtherance of that membership." *Id.*  The evidence showed that the Defendant shot Balance and Hunter because he and his co-defendants believed that Balance and Hunter had killed a Schuele Boys associate, Matt, just four days earlier.  Demario James testified that, at Matt's wake, the Defendant, Hicks, and others discussed "catch[ing] up with . . . the guy that killed Matt."  And, as noted earlier, Jessica Kazukiewicz, who was sitting in Balance's car before the shooting began, heard Balance and Hicks talking about "a shooting that happened on Carl Street" and heard Balance state that he "didn't kill the man."  The Defendant then shot Balance and attempted to shoot Hunter.  This is sufficient for a reasonable jury to conclude that the Defendant committed these acts of violence because the Schuele Boys felt the need to assert control over their territory and because the Defendant's role in the enterprise—that

is, what "was expected of him by reason of his membership," *Concepcion*, 983 F.2d at 381—was to use force to assert the Schuele Boys' territorial dominance.

There is no question that the evidence showed that the murder and attempted murder were, in part, acts of revenge. But that does not mean that they do not also satisfy the "purpose" requirement of § 1959: "A murder can both be 'an act of personal revenge' and still be 'tied to . . . racketeering activities.'" *United States v. Krasniqi*, 555 F. App'x 14, 17 (2d Cir. 2014) (quoting *United States v. James*, 239 F.3d 120, 124 n.5 (2d Cir. 2000)). From the evidence described above, a reasonable jury could have concluded that the Defendant's "purpose" in murdering Balance and attempting to murder Hunter was to "maintain[] or increas[e] [his] position in" the Schuele Boys. 18 U.S.C. § 1959(a).

### 3. Count 2 (Narcotics Conspiracy)

Finally, the Defendant renews his Rule 29 motion as to Count 2, which charged a narcotics conspiracy, in violation of 21 U.S.C. § 846. The Defendant argues that "[n]o one testified that [the] defendant was part of any agreement involving drugs of any kind and no one heard a conversation or was part of a conversation wherein the defendant was part of a drug sale or deal." Def. Mtn. ¶ 13. Similarly, the Defendant argues, only one witness testified that he was present when others were breaking down a bundle of marijuana, while "[n]o one said [the Defendant] funded or benefited from drug sales. Surely [the Defendant's] membership nor role in a drug conspiracy was not established." *Id.*

The Defendant's Rule 29 motion as to Count 2 must be viewed in light of the broad nature of conspiracy law. As the Supreme Court has recognized, "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a

substantive offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense." *Salinas*, 522 U.S. at 65. Or, put differently, different members of a conspiracy may perform different roles to further the members' common objective: "The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other." *Id.* at 63-64 (citing *United States v. Pinkerton*, 328 U.S. 640, 646 (1946)).

Viewed in the light most favorable to the Government, a reasonable jury could have found that, as with Count 1, the Defendant was the "muscle" for his co-conspirators' drug trafficking conspiracy. In other words, in the "divi[sion] [of] work," *id.*, the Defendant's job was not distribution, but was, instead, protection. Indeed, as Spencer Rogers testified, drug trafficking is territorial, and a drug dealer who attempts to sell drugs in another group's territory can expect violence.[11] A reasonable jury could have found that, within the Schuele Boys, the role of using violence to ward off rivals fell to the Defendant.

The most prominent evidence of this theory was, as noted several times, the overwhelming evidence that the Defendant murdered Quincy Balance, and attempted to murder Damon Hunter. But there was also more evidence from which a reasonable jury could have concluded that the Defendant was the Schuele Boys' "muscle": Demario James testified that Matt's wake was not the only time the Defendant had offered to "catch up to" someone. James testified that, in 2012, the Defendant approached him, said that

---

[11]  Rogers testified that he "fortified" a new drug house in a part of Buffalo outside the Schuele Avenue area but that the house was set on fire the day after it was opened for business.

"he knew the guy that had robbed" James of $3,300 worth of marijuana, and offered, "if [James] wanted him to take care of it," to do so "at a family price" of $5,000. Likewise, Jerome Grant testified, albeit more vaguely, that the Defendant had offered to perform similar services for him.

This evidence was sufficient for a reasonable jury to find that the Defendant's role in the narcotics conspiracy was protection, and not distribution. *See United States v. Barret*, No. 10-cr-809 (S-4)(KAM), 2012 WL 3229291, at *21-22 (E.D.N.Y. Aug. 6, 2012) (denying Rule 29 motion in narcotics conspiracy where defendant "was present" during "unloading, weighing, measuring, and distribution of over 225 pounds of marijuana"; where defendant "was given a gun to protect the marijuana"; where he purchased marijuana; where defendant was "always strapped"; and where he "protected . . . the leader of the conspiracy, during parties in which marijuana-related disputes were known to arise"). Protecting members of a narcotics conspiracy furthers the conspiracy's goal as much as selling narcotics does. The Defendant's motion for judgment of acquittal on Count 2 is, therefore, denied.

### C. The Defendant's motion to dismiss for lack of subject-matter jurisdiction

During trial, defense counsel adopted the Defendant's *pro se* motion to dismiss the superseding indictment for lack of subject-matter jurisdiction. *See* Docket No. 232. The motion seeks "documentation of subject-matter jurisdiction in which was completely absent from [the] superseding indictment" and claims that "[t]he prosecution has not included the jurisdictional language in the indictment." Docket No. 232 at 2. The motion also claims that the Court lacks subject-matter jurisdiction over this case because "[t]he government left out the fact that the alleged crime must occur within the territorial

jurisdiction of the United States pursuant to 18 U.S.C. § 7(3)" and because there is no evidence that one or several of the States ceded to the United States the territory on which the crimes in this case occurred. *Id.* at 5-6.

The Court has subject-matter jurisdiction over this case pursuant to 18 U.S.C. § 3231, which states that: "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the states, of all offenses against the laws of the United States. Nothing in [Title 18] shall be held to take away or impair the jurisdiction of the courts of the several states under the laws thereof." This law has been in effect since 1948, and it has never contained a requirement that an indictment allege historical legislative actions, or a requirement that documentary proof of such actions be placed in the record to trigger a district court's subject-matter jurisdiction. It is, instead, well settled that, "to invoke a district court's jurisdiction, an indictment need only allege that a defendant committed a federal criminal offense at a stated time and place in terms plainly tracking the language of the relevant statute." *United States v. Rubin*, 743 F.3d 31, 38 (2d Cir. 2014). The indictment in this case does that.

The Defendant's motion to dismiss also appears to argue that the superseding indictment contains other jurisdictional or pleading defects. This argument does not merit extended discussion. The offenses charged in the superseding indictment are well within Congress's power to criminalize. *See Gonzales v. Raich*, 545 U.S. 1 (2005); *United States v. Lopez*, 514 U.S. 549, 558-59 (1995); *United States v. Muyet*, 994 F. Supp. 501, 525 (S.D.N.Y. 1998).

The Defendant's motion to dismiss is, therefore, denied.

**CONCLUSION**

For the reasons stated above, the Defendant's motion for judgment of acquittal

and his motion to dismiss are both denied.

**SO ORDERED.**


Dated: December 19, 2017                    ____*s/Richard J. Arcara*_____
      Buffalo, New York                    HONORABLE RICHARD J. ARCARA
                                    UNITED STATES DISTRICT JUDGE