UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                              **DECISION AND ORDER**
                                                        15-CR-33-A

RODERICK ARRINGTON,

                    Defendant.

Pending before the Court is *pro se* Defendant Roderick Arrington's motion (Dkt. Nos. 679, 694) to dismiss the Superseding Indictment for an alleged violation of his due process rights, stemming from an incident in December 2021 at Cattaraugus County Jail ("the jail"), where Arrington is currently housed.[1]  The motion was filed on January 13, 2022.  The Government filed opposition papers (Dkt. No. 690), and Arrington filed reply papers (Dkt. No. 693).  Upon review of those submissions, the Court required (Dkt. No. 692) standby counsel to submit an under-seal affidavit regarding the circumstances of the December 2021 incident, including his personal knowledge of what occurred.

---

[1] Arrington's other requested relief asserted in this motion, to "recuse" his standby counsel, Robert Singer, Esq.—and the related motion by Mr. Singer (Dkt. No. 684) to be converted from standby counsel to "advisory counsel," or in the alternative, to withdraw—were both addressed at a status conference on May 25, 2022.  At that time, the Court relieved Mr. Singer from the case and appointed Mark Foti, Esq. as new standby counsel.  On June 14, 2022, the Court officially granted Arrington's request that Mr. Foti represent him at trial, and Mr. Foti accepted that appointment.  During a proceeding held on August 4, 2022, Arrington expressed that he now wants to represent himself at the trial.

Upon reading standby counsel's submission (Dkt. No. 697), the Court then directed (Dkt. No. 698) the Government to tender an affidavit or affidavits from FBI Agents and/or jail personnel at the jail with personal knowledge of the subject incident.  That supplemental response (Dkt. No. 704) was filed, along with two video exhibits (*see* Dkt. No. 704-3 [Exhibit C]).[2]

After assessing the parties' filings, the Court determined an evidentiary hearing was necessary as it could not make a ruling solely on the papers.  A two-day hearing was held on June 13, 2022 and June 14, 2022.  *See* Dkt. Nos. 733 (CM/ECF Minute Entry, 06/13/2022), 734 (CM/ECF Minute Entry, 06/14/2022), 744 (Hearing Tr., 06/13/2022), 745 (Hearing Tr., 06/14/2022).  Post-hearing oral argument was held on August 4, 2022, at which time the Court deemed the matter submitted.[3]

For the reasons set forth below, Arrington's motion to dismiss on due process grounds is DENIED.

## **BACKGROUND**

The Court assumes the parties' familiarity with the procedural history of this case, which was discussed extensively in the Court's November 18, 2021 Decision and Order (Dkt. No. 657) ruling upon various pretrial motions, and the Court's June 1, 2022 Decision and Order (Dkt. No. 724) denying Arrington's motion to dismiss the Superseding Indictment for alleged violations of the Speedy Trial Act and Sixth

---

[2] The Court ensured that Arrington viewed the video exhibits (*see* Dkt. No. 709).

[3] The Court had aimed to schedule the oral argument for a few weeks after the hearing, but Arrington asked for a copy of the somewhat voluminous hearing transcript to prepare for the argument.  Early August 2022 was therefore the earliest the Court could feasibly hold argument on the hearing.

Amendment right to a speedy trial.  Thus, the Court discusses that history only to the extent necessary to resolve the instant motion.

I.     **Issuance of Protective Orders**

The Court previously granted the Government's motion to seal (Dkt. No. 599) any filings by Arrington that discuss grand jury testimony, as well as the Government's request (Dkt. No. 609, Exhibit A; *see* Dkt. No. 132 [original protective order]) to enter an amended protective order to account for Arrington's *pro se* status. On November 24, 2021, the Court executed an amended protective order (Dkt. No. 666) (hereinafter, "the Protective Order" or "the Order").[4]

The Protective Order specifies the way certain documents are to be provided to Arrington, as a *pro se* litigant, allowing for his review of those documents but in a controlled and monitored setting.  Those documents are listed as follows: "3500 material, Giglio/ impeachment information, pre-trial submissions, and prior trial transcripts and documents" (hereinafter, "protected materials").

The Order states,

> "[t]he defendant shall immediately surrender any such materials currently in the defendant's possession to Jail staff upon entry of this order.  No one shall make copies, or allow copies of any kind to be made by any person, of any of those materials.  No one in the Jail shall read the

---

[4] A colloquy was held on February 10, 2021 pursuant to *Faretta v. California*, 422 U.S. 806 (1975), at which the Court found Arrington mentally competent in his decision to proceed *pro se* in this matter and assigned his first standby counsel.  During that colloquy, the Court explained to Arrington that if he chose to represent himself, he "may not be permitted to have access to certain sensitive law enforcement information as [he] prepare[s] for trial," due to the original protective order.  Arrington affirmed his understanding.  Dkt. No. 588, pp. 27-30.  It was later confirmed that Arrington's first CJA counsel, appointed after the Second Circuit Mandate was issued remanding this case for a retrial, provided the grand jury materials in his possession to Arrington at Arrington's request and in violation of the original protective order.  *See* Dkt. No. 657, pp. 18, 25, 25-26 n.11.

> materials except the defendant and the defendant's
> standby counsel[.]"

It was also ordered that

> "the defendant may access those materials only outside
> the presence of other inmates, either via a computer with
> no internet connection or printer, or in hard copy. The
> defendant shall be permitted to take notes and those
> notes shall be collected at the end of each review session.
> The defendant shall be supervised by Jail staff at all times
> while reviewing those materials, or if left alone for review,
> he shall be searched prior to returning to his cell or the
> presence of other inmates[.]"

Last, the Order states that "violation of this Protective Order may be deemed

contempt of court pursuant to 18 U.S.C. § 401[.]"

## II.   Arrington's Account and Motion to Dismiss

In Arrington's motion papers, he claims that as soon as the Court issued the

Protective Order on November 24, 2021, he attempted to hand over the protected

materials to jail officials, but Captain Eric Keller refused to accept them until he

"heard from [the] Court." Then, according to Arrington, on December 22, 2021,

when FBI agents arrived to enforce the Court's Protective Order that they had in

hand, Arrington was "tricked" out of his jail cell and taken to another area of the jail

while the search and seizure took place. Per Arrington's account, the FBI agents

falsely told him they had a search warrant and "raid[ed]" his cell. They took all of his

personal property, personal mail, and legal materials (including those integral to his

defense strategy), and "other sensitive materials [he] had that prove[ ] [he is

innocent] and other evidence to prove [. . . ] government misconduct."

4

Arrington did not see his seized property until two weeks after December 22, 2021, and according to him certain materials were missing, including two letters from a witness who he was going to subpoena to testify on his behalf at the trial, and one manilla envelope containing other trial materials.

## **FINDINGS OF FACT**

Because the due process claims by Arrington are of concern to the Court, the facts and circumstances leading up to and including the attempted enforcement of the Court's Protective Order are critical to the Court's assessment of Arrington's motion.  Thus, the Court will go into meticulous detail in its fact-finding surrounding the search of Arrington's jail cell and seizure of his papers—to determine whether Arrington's rights were violated, as claimed by Arrington.

On June 13, 2022 and June 14, 2022, the Court held a hearing on Arrington's due process motion to dismiss to address the following: (1) the chain-of-custody of the papers that were taken from Arrington's jail cell on December 22, 2021; (2) papers Arrington alleges are missing; and (3) concerns about possible review of privileged attorney-client communications and Arrington's work product.

During the hearing, the Court heard testimony from two witnesses called by the Government, Special Agent Jared Fitzgerald of the Federal Bureau of Investigations ("FBI") ("Agent Fitzgerald") and Jail Superintendent and Captain of Cattaraugus County Jail Eric Keller ("Captain Keller").  Arrington called a total of eight witnesses, including Agent Fitzgerald's colleague, Special Agent Robert Colunga of the FBI ("Agent Colunga").  Agent Fitzgerald, Captain Keller, and Agent

Colunga were all directly involved in the search of Arrington's jail cell and seizure of his papers on December 22, 2021.

Arrington also called his former standby counsel, Robert Singer, Esq. (Mr. Singer), who communicated with Agents Fitzgerald and Colunga, Captain Keller, and Assistant U.S. Attorneys ("AUSAs") Jeremiah Lenihan and Bethany Lipman on December 22, 2021, and later visited the jail on January 4, 2022 to review the documents seized from Arrington's cell and to separate out the materials covered by the Protective Order.  The remainder of Arrington's witnesses (*i.e.*, Sergeant Brittnie Phillips, Officer Eric Blue, Officer Deanne Crowley, Sergeant Timothy Higgins, Officer Darryl Flick, and Officer David Rosing) were jail officials with either peripheral involvement or no personal involvement in the events of December 22, 2021 and/or January 4, 2021.  Arrington did not testify at the hearing.[5]

I.    **Protective Order**

As noted above, the Protective Order (Gov't Exhibit #1) was issued on November 24, 2021.  Captain Keller testified that shortly thereafter, he was asked by the Government to secure the protected materials from Arrington, but he did not feel qualified to distinguish between what was covered and what was not covered.  At that juncture, it was decided that FBI agents would come to the jail to assist with obtaining the protected materials from Arrington.  On cross-examination, Captain Keller was asked why he did not ask Arrington "in good faith" to turn over the protected materials himself.  Captain Keller responded that he was not going to give

---

[5] After the last defense witness testified on June 14, 2022, Arrington asked to call the two Assistant U.S. Attorneys, Jeremiah Lenihan and Bethany Lipman, to testify.  The Court denied this request.

Arrington "the benefit of the doubt" and he did not think it would be appropriate for

Arrington to be present for the search and seizure.  Also, if Captain Keller had

allowed Arrington to voluntarily surrender the protected materials, he would have

had no way of knowing if everything was turned over.

Sergeant Brittnie Phillips, who was aware of the December 22, 2021 incident,

explained that it is jail policy to remove inmates from their housing units during a

search.  She testified on cross-examination that she "[a]bsolutely" does not defer to

inmates regarding what should or should not be seized during a cell search, and she

agreed when questioned on cross-examination that it is not a good idea to have a

"very upset" inmate present during a search (and Arrington was "upset" when she

saw him in holding area), as that scenario places both officers and other inmates'

safety at risk.  Officer Eric Blue testified that Arrington made several attempts to give

him § 3500 materials from his cell but he declined to take those papers without an

order from the Government or the Court.

Mr. Singer testified that it was his understanding that Arrington was to

surrender certain materials to jail staff upon entry of the Protective Order.  Nothing in

the Protective Order specified how it was going to be enforced.  Arrington had

informed Mr. Singer that he had segregated documents he believed to be covered

by the Protective Order, and that he was prepared to turn them over.  However, Mr.

Singer was only aware of what papers Arrington had in his possession based on his

filings—he did not know what other papers were contained in Arrington's cell.

According to Agents Fitzgerald and Colunga ("the FBI agents"), members of the FBI assigned them to execute the Protective Order, which they read before they arrived at the jail.

## II.   Events of December 22, 2021

The morning of December 22, 2021, on their drive to the jail to execute the Protective Order, Agents Fitzgerald and Colunga had a 10- to 15-minute conversation with AUSAs Lenihan and Lipman ("the AUSAs"), as well as Mr. Singer. According to the FBI agents, everyone was on the "same page"—essentially, the FBI agents were to assist jail staff in gathering up some documents from Arrington's cell and/or determining what looked like § 3500 material (in other words, grand jury material).  Agent Fitzgerald testified, however, that they were not to make any sort of "inventory" of the papers or decide what was and was not § 3500 material.  Instead, Mr. Singer was going to go through all the papers later on to determine what material was and was not covered by the Protective Order.

Mr. Singer testified that at about 9:30 AM, he received a phone call from the AUSAs and the FBI agents concerning the FBI agents' enforcement of the Protective Order and that they were 30 minutes away from the jail.  Mr. Singer asked the AUSAs if he could meet with the FBI agents on another day, but he was told that was not possible.  Mr. Singer had several concerns: he did not know if the FBI agents were a part of the prosecution team, and he was worried that they might improperly review Arrington's work product.  He agreed the situation was "rushed" but testified that he did his best "under the circumstances," suggesting that jail staff box up Arrington's papers and keep those in their possession until Mr. Singer could

8

review the papers himself—the plan everyone ultimately agreed to.  Mr. Singer did

not want anyone searching Arrington's papers, which explained why he did not

receive any inventory sheet from December 22, 2021.

    After the phone call, Mr. Singer contacted the jail at around 9:40 or 9:45 a.m.

and spoke with Captain Keller to alert him that FBI agents were on their way to seize

papers from Arrington's cell.  He asked to speak with Arrington before the FBI

agents went into the cell, so Arrington would understand what was happening and

why.  Mr. Singer also spoke with Arrington on the phone that morning and

remembered Arrington asking him why he had "trick[ed Defendant] out [of his] cell"

and "set [him] up."  Arrington also asked Captain Keller to permit Arrington's

presence during the search.  Mr. Singer was unaware of any plan to move Arrington

out of his cell to a different location in the jail during the search.

    Sergeant Timothy Higgins testified that he woke Arrington up the morning of

December 22, 2021 and told him to go to the "holding" area downstairs (a different

area than C-Pod, Arrington's housing unit) to speak with Mr. Singer privately.  He

explained that it is "common practice" to take inmates down to the holding area for

calls with their attorneys.[6]  Sergeant Higgins, Sergeant Phillips (who coordinated the

phone call between Mr. Singer and Arrington), and Captain Keller all testified to the

effect that the phone call between Mr. Singer and Arrington was not a "trick"

orchestrated so that Arrington would be absent during the search.  Rather, Mr.

---

[6] Sergeant Higgins identified himself in the video footage, observing the FBI agents' search of Arrington's cell (Gov't Exhibit #2), which is discussed further herein.

Singer had simply requested to speak with Arrington to explain what was happening, and the call took place outside of C-Pod.[7]

In the meantime, Agents Fitzgerald and Colunga arrived at the jail and met with Captain Keller, who escorted them to Arrington's jail cell in C-Pod.

During Agent Fitzgerald's testimony, the video footage capturing the search and seizure was marked and entered into evidence (Gov't Exhibit #2).[8]

Part of the video was played during Agent Fitzgerald's testimony, and he described what occurred. Captain Keller brought a table over that he placed just outside of the jail cell for the FBI agents to place documents on (Gov't Exhibit #2, 2:34).[9] Agents Fitzgerald and Colunga were looking for "any" papers to place on the table, which were in various locations around the cell (2:53). Agent Fitzgerald did not read any of the papers; he merely observed the words "Grand Jury" on top of some of the papers, and that there were some handwritten notes—Agent Fitzgerald insisted he did not actually read any grand jury testimony or any of the handwriting. The FBI agents placed papers and manilla envelopes on the table, without opening

---

[7] During the hearing, Arrington attempted to establish that he was "tricked" out of his cell and told that the FBI agents had a warrant to search his cell, when in reality they had only the Court's Protective Order in hand. Both Sergeant Phillips and Mr. Singer testified that they recalled hearing Arrington ask to see "the warrant" or a copy of "the warrant" when he was in the holding area. Sergeant Phillips observed Captain Keller hand a piece of paper to Arrington (she did not see what was written on the paper herself). She heard Captain Keller state that FBI agents were at the jail and they had "orders" to search Arrington's cell; she could not recall the exact wording that was used. According to Captain Keller, he never told Arrington that he had a "warrant" to search his cell. The Court concludes that the testimony did not establish Arrington was deliberately "tricked" out of C-Pod, nor did it establish that individuals lied to him and incorrectly told him the FBI agents had a warrant.

[8] The Court independently viewed the entirety of the video, which is approximately 15 minutes long, prior to the hearing.

[9] Hereinafter and for ease of review, the Court refers to timestamps from the video exhibit, where appropriate.

the envelopes or reading the papers within them (3:17).  They then performed another "quick check" to see what else could be in the cell (4:18) and left the cell with nothing in hand (4:25).  The FBI agents did not read any of the documents that they placed on the table and did not learn any of Arrington's trial strategy.

Jail staff then closed the cell (4:33) and Captain Keller retrieved a box, in which all the papers and envelopes from the table were placed.  Agent Fitzgerald picked up the box and handed it to Captain Keller.  The FBI agents and Captain Keller then exited a door depicted on the righthand side of the screen (6:27), which is when they took the box to Captain Keller's office, a short walk away and within the building.  Agent Fitzgerald observed the box being placed in Captain Keller's office, at which time no one reviewed the papers.

It was somehow conveyed to the FBI agents (Agent Fitzgerald was unsure how, but he knows he did not have any contact with Arrington that day) that there were potentially more documents under Arrington's mattress.  A couple minutes after the FBI agents and Captain Keller had left C-Pod they returned to retrieve the additional papers from Arrington's cell (11:55-12:01).  The FBI agents lifted Arrington's mattress and found documents under it, lined up in rows and columns (12:44).  Again, they placed all of these in a pile.  They again left the cell with nothing in their hands (14:13).  Agent Colunga carried the stack of papers and he and Agent Fitzgerald followed Captain Keller to his office yet again.

The FBI agents were inside Arrington's cell for a total of approximately 5 minutes.  They were not at the jail for much longer than the entirety of the video (15 minutes), estimated at anywhere from 25 to 40 minutes, total.

11

Agent Fitzgerald insisted that he did not convey anything from the documents to the prosecution team, the AUSAs, or other FBI agents.  Neither he nor Agent Colunga pursued any "leads" resulting from December 22, 2021, and the entire time they were at the jail they were accompanied by jail staff.  Agent Fitzgerald did not remember seeing anyone read the documents.  He did not take anything into his possession—everything was placed in the box or the second stack of papers.  He did not leave the jail with any papers and did not see anyone else leave the jail with any papers.  He did not destroy any papers, either.  To his knowledge, Agent Fitzgerald did not leave <u>any</u> papers or documents in Arrington's cell.

On cross-examination, when Agent Fitzgerald was questioned about a statement in his affidavit that he "briefly check[ed] the contents of papers" (*see* Dkt. No. 704-1, ¶ 5), Agent Fitzgerald insisted that he did not read what was inside the envelopes or the contents of the papers.

Agent Fitzgerald testified that he did not know what happened to the box of papers after he left the jail, as he never returned to the jail himself.

Agent Colunga had not seen any video footage prior to the hearing but was shown a part of the video when he testified, and he identified himself and Agent Fitzgerald in it.[10]  His testimony concerning the search and seizure on December 22, 2021 was largely consistent with Agent Fitzgerald's testimony.

According to Agent Colunga, when they followed Captain Keller to his office each time, Captain Keller placed the documents in his office and locked the door

---

[10] Agent Colunga identified himself as the individual in the blue shirt, whereas Agent Fitzgerald was wearing a plaid shirt (4:33).

behind them.  After he and Agent Fitzgerald went into the cell the first time, he remembered that they had never looked under Arrington's mattress.  This realization is what triggered their second search of the cell; no one else informed them about the additional papers, and Agent Colunga did not recall any conversation with Arrington alerting him of the papers under the mattress.

Consistent with Agent Fitzgerald's testimony, Agent Colunga testified that at no time did he or Agent Fitzgerald read through the papers to distinguish what constituted grand jury materials and what did not.  Agent Colunga never read any of the papers or contents of the manilla envelopes and did not take any papers outside of the jail when he left.  He did not gain any insight into Arrington's trial strategy.  He did not take or destroy any documents and was accompanied by jail staff the entire time they were at the jail.  Agent Colunga explained that preparing an inventory of the documents they seized (which they did not do) would have required him to read the papers in depth, which he had been specifically instructed to not do.

Neither Agent Fitzgerald nor Agent Colunga was the lead case agent in the instant criminal case, and neither of them was involved in the investigation of this case either.  Agent Fitzgerald testified that he did not know what the allegations against Arrington were, and the first day he was involved in this case was on December 22, 2021.  Agent Colunga testified that his only involvement in this case was obtaining documents on December 22, 2021; he did execute a search warrant for Arrington's DNA/ conduct a buccal swab of Arrington, but that was another investigation involving a different case.  Agent Colunga further testified that the Government had no "motive" in sending him, specifically, to Arrington's cell.

Captain Keller's testimony was also largely consistent with the testimony of the FBI agents concerning the events of December 22, 2021, although he did provide further testimony about the security of his office, the chain-of-custody of the box of papers, and possible additional jail video footage.

Captain Keller testified that there was an "overwhelming amount" of documents in Arrington's cell.  He recalled (differently from the FBI agents) that the FBI agents spoke with Arrington, who informed them that he had more papers under his mattress, which prompted them to enter the cell a second time to grab more papers that they then added to the box.  Captain Keller did not see the FBI agents closely studying or viewing the papers or going through the envelopes in any detail. His understanding was that they were not to be scrutinizing the documents "really closely," so no inventory of the documents was created.

It was Captain Keller who decided to place the seized papers in his office. The FBI agents asked him to hold onto the papers for Mr. Singer's review, and he thought it would be the "most secure" location in the jail with no access to other individuals, unlike many other areas of the jail.  In other words, it was "the safest" area for the box to be stored.

Captain Keller testified that his office was "down the hallway and around the corner" from C-Pod.  His office used to be a closet, and now contains a computer and desks, with no windows.  The majority of his workday Captain Keller is in his office completing paperwork.  His office is never left unlocked.  Only one other person has access to Captain Keller's office, Lieutenant George, who has a key but does not come and go regularly.  Lieutenant George never enters Captain Keller's

office when he is not there, other than when Captain Keller is at home or on vacation and he asks her to grab something specific from his office for him.  Captain Keller testified that his office is under his own control.

When he and the FBI agents arrived at his office, Captain Keller placed the box of papers to the immediate left of the door, on top of a desk.  Neither he nor the FBI agents looked through any of the papers while there.  He closed his office door and locked it, which is his regular practice.

To Captain Keller's knowledge, no papers taken from Arrington's cell were removed from the jail or destroyed.  The entire search and seizure process took about a half hour, from the FBI agents' arrival at the jail to their departure.  At no time did the FBI agents return to the jail after December 22, 2021.

III.   **Events of January 4, 2022**

Mr. Singer testified that on December 22, 2021, he told Captain Keller and Arrington that because it was his last day in the office and the Christmas holiday was approaching, he could not visit the jail until December 27, 2021.  However, on December 27, 2021 he felt ill, took a COVID-19 test, and tested positive.  Mr. Singer did not want to expose inmates to COVID-19, so he quarantined and traveled to the jail only when he was asymptomatic.

On January 4, 2022, Mr. Singer went to the jail to go through the box of papers from Arrington's cell.  Captain Keller told him the only way Mr. Singer could review the documents was alone in the jail lobby.  Mr. Singer asked if he could speak with Arrington after his review, in non-contact visitation, but Captain Keller denied this request because of Mr. Singer's recent positive COVID-19 test.

15

Upon arrival, Mr. Singer placed two phone calls to the jail's front desk and met with a deputy at the front door lobby.  He was scanned for contraband and his temperature was checked.  Then, Captain Keller came out from another area of the jail to the lobby with the box of papers from Arrington's jail cell.  He handed the box to Mr. Singer, who then created two piles of papers, one pile with protected materials and one pile with documents that were not protected, along with an inventory.  Approximately 30% of the papers were covered by the Protective Order, many of which were trial transcripts, although there was also *Jencks* Act materials and grand jury transcripts.

Video footage of the jail lobby from January 4, 2022 (Gov't Exhibit #3) was published for Mr. Singer at the hearing.[11]  Mr. Singer identified himself in the video, noting it showed him waiting for Captain Keller after segregating the protected material from the non-protected material (44:08).  One pile was a little taller than the other but not by much.  A few minutes later, Mr. Singer and Captain Keller were discussing which pile was to be returned to Arrington and which pile should be segregated (the latter was the shorter pile on the right side of the screen, which included some papers Arrington had already separated out himself) (51:13).  At the end of the video, Captain Keller had both piles back in his possession (53:42).

Mr. Singer testified that he did not take any papers from the jail, and never communicated Arrington's trial strategy to the Government.  While Mr. Singer was concerned that the Government might try to learn Arrington's trial strategy, it never

---

[11] The Court independently viewed the entirety of the second video prior to the hearing, as well.

gave him any indication of doing so.  Mr. Singer testified, in response to Arrington's questioning, that he did not "conspire" with the Government.

Captain Keller similarly testified about Mr. Singer's visit to the jail on January 4, 2022.  Because Mr. Singer had just recovered from COVID-19, he viewed the box of materials in the visitation area of the jail, which had enough privacy.  Captain Keller did not leave the materials unattended—he carried the documents out to Mr. Singer from his office that day.  As far as Captain Keller knew, the documents that were seized from Arrington's cell were the exact same ones Mr. Singer reviewed. Captain Keller argued with Arrington because Arrington wanted to be present with Mr. Singer while Mr. Singer went through the materials.  However, Captain Keller did not think Arrington's presence was required, and because Mr. Singer had just gotten over COVID-19 he did not want to risk exposing Arrington.

Captain Keller was also shown the video footage of the jail visitation lobby (Gov't Exhibit #3) during the hearing, which he testified was a fair and accurate copy thereof.[12]  Captain Keller testified that he was depicted on the righthand side of the video at 51:34 and Mr. Singer was on the left.  Towards the end of the video, Captain Keller returned to the lobby to retrieve the two piles of papers from Mr. Singer.  The pile of protected materials was about four to five times greater than the volume of papers Arrington had said were under his mattress that he believed he

---

[12] The video was played on a quicker speed during the hearing due to the almost-hour length of the video.

was to turn over to jail officials.  Mr. Singer left the jail, and Captain Keller took the protected materials out of the lobby directly to the jail's classroom.[13]

The jail classroom is on the second floor of the jail and is where classes and religious services are held.  Captain Keller placed the box in a secure closet (a solid steel door that opens with a key and is locked) off the classroom, so that Arrington could review the protected materials on the computer with an officer present.  As of the date of the hearing, those protected materials had not left the jail classroom. Captain Keller testified that later in the day on January 4, 2022, Arrington obtained access to the box of protected materials, so "almost immediately" after Mr. Singer's review of the papers was completed.

When Arrington was first brought to the jail classroom to review the protected materials, Captain Keller left the room and went to his office while a different jail official supervised Arrington.  A "short time" later, Arrington said he was done reviewing everything and claimed certain items were missing.  Because of the short length of time Arrington had reviewed the papers, Captain Keller concluded Arrington was making up the missing papers and lying about that to try and "get out of" the criminal charges against him.  After that day, Arrington had not complained anything else had gone missing.

---

[13] Captain Keller corrected a typo in his affidavit that suggested the documents were stored in the jail classroom on December 22, 2021.  Rather, from December 22, 2021 until January 4, 2022 they were stored in his office, and then transferred to the jail classroom on January 4, 2022.  *Compare* Dkt. No. 704-2, ¶¶ 3-4 *with* ¶ 5.

IV.     <u>**Admission of Video Footage**</u>

During the hearing, Arrington objected to admission of the two videos (Gov't Exhibits #2 and #3) into evidence based on his argument that they had been intentionally edited, and/or other video footage from the jail should have been retained because it would have fully depicted the events of December 22, 2021 and January 4, 2022.

Captain Keller testified that, to his knowledge, there is no formal policy at the jail regarding video retention.  Generally, video footage is overwritten about every 30 days, unless if there is a "serious incident" or a Court order prompting jail staff to download and save specific footage from the jail's computers to a USB drive. Footage is not typically retained only if an inmate requests it, as that would be time-consuming and unreasonable based on the jail's limited resources.  The first conversation Captain Keller had with the AUSAs about any surveillance footage was in the lead-up to the hearing, well after the 30-day retention period had passed.

Captain Keller retained December 22, 2021 C-Pod footage (Gov't Exhibit #2) of the search and seizure because Arrington was complaining about what had happened.  He did not retain some of the January 4, 2022 footage of the lobby due to his own error.  The latter video (Gov't Exhibit #3) begins with Mr. Singer already reviewing the box of materials and does not depict Captain Keller handing him the box first.  Captain Keller explained that he hits "record" when he downloads video footage, but he must have entered the wrong start and end time when doing so.  He did not watch the video until later, when Arrington questioned who was present in the lobby on January 4, 2022, and by then it was too late to correct.  Nevertheless,

19

Captain Keller unequivocally testified that Mr. Singer was the person who was present in the lobby on January 4, 2022 and who went through Arrington's papers, and Captain Keller was the one who brought the box out to him.

No other video footage was retained aside from the footage in Government Exhibits #2 and #3, as any other footage had been overwritten by the time Arrington subpoenaed it.  While Arrington had asked Captain Keller prior to Arrington's subpoena that further footage be retained (he filed a grievance to this effect), Captain Keller saw no reason to retain it.  He was unaware of any video cameras that would have captured what went on inside of Arrington's cell or inside of his own office.  While there was a camera outside of Captain Keller's office, he did not think it was important to save that footage.  He also explained he thought it unnecessary to save footage of him and the FBI agents walking down the hallway from the C-Pod to his office.

## V.   Delay of Arrington Filing His Bail Motion

Mr. Singer testified that during a status conference via Zoom in December 2021, the Court told Arrington that he could file a bail motion.  Mr. Singer was unaware a number of days later that the jail did not permit Arrington access to his papers between December 22, 2021 and January 4, 2022.  He agreed that the events of December 22, 2021 and Arrington's lack of access to his papers delayed Arrington's ability to file his bail motion, which was ultimately filed.

## VI.   Credibility Findings

Contrary to Arrington's position, after having the opportunity to carefully listen to Agents Fitzgerald and Colunga, Captain Keller, and Mr. Singer, and observe their

demeanors during the hearing, the Court finds them to be credible.  Despite minor

discrepancies between their narratives, their testimony was largely consistent.  The

Court also finds the testimony of the remaining jail officials who were only

tangentially involved in the pertinent events, Sergeant Phillips, Officer Blue, Officer

Crowley, Sergeant Higgins, Officer Flick, and Officer Rosing, to be credible as well

and to corroborate certain aspects of the other witnesses' testimony.

## CONCLUSIONS OF LAW

Arrington seeks dismissal of the Superseding Indictment, with prejudice, "for a

multitude of Constitutional [v]iolations" in relation to the December 22, 2021 incident,

and for the Government's alleged failure to adhere to the Protective Order.

Arrington primarily asserts that the events surrounding December 22, 2021 violated

his substantive due process rights under the Fifth Amendment, as "outrageous

government conduct" that was "shock[ing to] the conscience" and "violat[ed]

fundamental fairness" in a criminal proceeding.  He also asserts the Government

violated his rights under the Fourth, Sixth, and Fourteenth Amendments.

At oral argument on the instant motion, Arrington argued the Government

must have reviewed his privileged documents after they were intentionally taken

from his cell by the FBI agents with Captain Keller's assistance, and dismissal of the

Superseding Indictment is the only appropriate recourse because his exculpatory

evidence has been destroyed and his trial defense jeopardized—thereby denying

him his right to a fair trial.  The Court concludes, as is explained further below, that

this argument is not supported by any of the evidence presented at the hearing, and

therefore the Court rejects this argument as having no basis in fact.

21

Aside from dismissal, in his papers Arrington requests relief in the alternative, in the form of a "full investigation" by the Court; return of "all missing property, the two letters and [his] manilla envelope with [his] legal materials for trial"; and that the Court hold all individuals involved in contempt of court.

The Government responds that the Protective Order required Arrington to immediately surrender protected material and not have access to protected material outside the presence of jail officials.  It contends that his substantive due process rights were not violated because the Government merely appropriately enforced the Protective Order, and Arrington has not shown prejudice or conduct that "shocks the conscience."  Moreover, the Government argued during oral argument on the motion to dismiss that the hearing testimony and video footage reveal there is no evidence that any of Arrington's papers were taken from the jail, lost, or destroyed.

I.   **Various Constitutional Violations Asserted by Arrington**

Preliminarily, the Court addresses Arrington's framing of this incident as violating a panoply of his rights under the U.S. Constitution, aside from violating his substantive due process rights, which is discussed further below.

According to Arrington, the events of December 22, 2021 amounted to an unconstitutional search and seizure under the Fourth Amendment, without a warrant and without him present.  He also argues that his Sixth Amendment rights were violated, seemingly because both privileged material (his attorney work product as a *pro se* defendant) was improperly accessed and because he was denied his right-of-access to the courts in the two-week timeframe he was without his legal materials.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV.  Pretrial detainees, like Arrington, retain Fourth Amendment protection against searches performed "at the instigation of non-prison officials for non-institutional security-related reasons."  *United States v. Cohen*, 796 F.2d 20, 24 (2d Cir. 1986).  However, just because pretrial detainees "retain certain constitutional rights does not mean that these rights are not subject to restrictions and limitations."  *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).  As such, courts must weigh pretrial detainees' residual privacy interests protected by the Fourth Amendment against the requirements of preserving institutional security and order. *See United States v. Willoughby*, 860 F.2d 15, 21 (2d Cir. 1988).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI.  Criminal defendants additionally have a constitutional right to represent themselves, a right that is "necessarily implied by the structure of the [Sixth] Amendment."  *Faretta v. California*, 422 U.S. 806, 819 (1975).

The intersection of various rights of defendant pretrial detainees when their jails cells are searched and/or property is seized has been addressed by both the Second Circuit Court of Appeals and the Southern District of New York.  This case law provides the Court with some guidance in the instant matter.

In *Cohen*, the Second Circuit found that a "contraband," warrantless search of the defendant's jail cell was conducted by a corrections officer at the behest of the prosecutor who was intent on bolstering trial proof, "solely to obtain information for a superseding indictment."  *Cohen*, 796 F.2d at 21, 23-24.  The search of the cell took

about a half-hour, and the corrections officer examined the papers for another hour after that.  *Id.* at 21.  A detective then relied primarily on information obtained during the warrantless search to obtain a search warrant from a magistrate authorizing the seizure of all "written, non-legal materials belonging to [defendant]."  *Id.*  When the defendant moved to suppress evidence seized from his cell pursuant to the search warrant, the district court suppressed some of the material on Sixth Amendment grounds, "but refused to suppress the remaining papers or to declare the search unlawful on Fourth Amendment grounds."  *Id.*

On appeal, the Second Circuit held "it [was] plain [in that particular case] that no institutional need [was] being served."  *Id.* at 24.  It thus concluded that documents taken from the defendant's cell were improperly admitted into evidence at trial because they had been seized in violation of the defendant's Fourth Amendment rights, and remanded the case for the district court to decide whether the failure to suppress the documents was harmless error.  *Id.* at 24.  The Second Circuit also instructed the district court to hold a "taint hearing to consider what fruits, if any, were obtained from information seized in the warrantless search [.]"  *Id.*

Here, like in *Cohen*, the search of Arrington's cell was warrantless and conducted at the direction of the prosecutor.  But this case is distinguishable in that the FBI agents were attempting to enforce the Protective Order, and the papers were not read by either the FBI agents or Captain Keller (other than phrases such as "Grand Jury" that caught their attention or handwriting that they generally noticed was on the papers).  Indeed, the FBI agents testified explicitly, and without question, that they did not review the papers because they were told not to, and they instead

gathered the papers for Mr. Singer's later analysis.  The video evidence corroborates that the FBI agents were in Arrington's cell for a short period of time, a matter of minutes.  The Court can conclude based on that timeframe and the volume of papers and envelopes placed outside of Arrington's cell that the FBI agents would not have had time to read anything of substance in Arrington's papers.

Moreover, the FBI agents testified that they did not learn any of Arrington's trial strategy.  There was also testimony to the effect that they did not communicate anything from Arrington's papers to the prosecution team, the AUSAs, or other FBI agents, and no "leads" in the case resulted from the events of December 22, 2021.  In other words, the Government did not retain any of the documents from Arrington's cell (or glean any information those documents) to bolster its proof at trial.  Thus, there would be nothing to suppress here—and Arrington is not seeking suppression, he is seeking dismissal of the case.

In a recent case out of the Southern District of New York, *United States v. Schulte*, S-2 17 Cr. 548 (PAC), 2019 WL 5287994, 2019 U.S. Dist. LEXIS 180889 (S.D.N.Y. Oct. 18, 2019), the defendant moved to suppress all documentary evidence seized from his cell by the FBI at the direction of the Government and pursuant to multiple warrants, and evidence recovered from subsequent warrants relying on the writings that had been seized.  *Id.* at *1-3.  The defendant in *Schulte* argued that suppression was appropriate under the Fourth and Sixth Amendments, and the doctrine of attorney-client privilege.  *Id.* at *1.

The Court ultimately denied the defendant's motion to suppress evidence seized from his jail cell.  *Id.* at *2.  It noted that " 'the Fourth Amendment is not

violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category.' " *Id.* at *5, quoting *United States v. Riley*, 906 F.2d 841, 845 (2d Cir. 1990).  The Court also observed that "[e]ven if law enforcement seizes privileged material alongside responsive information, the general remedy for violation of the attorney-client privilege is to suppress introduction of the privileged information at trial, not to order wholesale suppression."  *Id.* at *5-6 (internal quotation marks and citations omitted).  The defendant had failed to cite any authority for the proposition that notebooks self-marked as "privileged" are "categorically immunized during a search pursuant to a warrant" or that they become privileged simply by labeling them so.  *Id.* at *7.  Moreover, even if certain pages of notebooks seized from the defendant's cell "may have contained intermingled irrelevant or privileged information" that did not invalidate the search; rather, those sections of notebooks were to be suppressed. *Id.* at *8.  The FBI agents' "cursory review" to ascertain the papers' relevance likewise did not render the search invalid or warrant dismissal of all evidence.  *Id.*

Last, the district court in *Schulte* held that it did not yet know what documents would be introduced at trial, and the Government agreed that it would not be seeking to introduce any documents the defendant identified as privileged.  *Id.* at *10.  The district court therefore held, "[a]s the case progresses, if the Government intends or seeks to introduce privileged documents at trial, then the [d]efendant can move to suppress any allegedly privileged documents."  *Id.*, citing *United States v. Schwimmer*, 892 F.2d 237, 244-245 (2d Cir. 1989).

Again, this case is distinguishable because Arrington is seeking dismissal, not suppression.  Furthermore, while Arrington is asserting a violation of his Sixth Amendment rights and infringement on his attorney-client privilege (*i.e.*, his handwritten notations on his documents), as did the defendant in *Schulte*, it is clear from the hearing testimony that the Government is not attempting to use any privileged documents from the December 22, 2021 incident against Arrington.  No papers taken from Arrington's cell (including any covered by the attorney-client privilege) were retained by any individual or removed from the jail or destroyed—per the testimony of the FBI agents and Captain Keller.  Rather, the papers were removed from the cell and then stored by Captain Keller in his secure office until Mr. Singer could conduct a detailed review of them.

Arrington argues that a line of case law concerning "shakedowns," or "a surprise search for contraband," applies here.  *See Steinberg v. Taylor*, 500 F. Supp. 477, 478 (D. Conn. 1980).[14]  He argues that when shakedowns occur, prison officials are required to adhere to certain "procedural safeguards" that were not followed here; for example, he asserts he did not receive any property receipts for the December 22, 2021 "raid."  *See* Dkt. No. 693 (Arrington's reply); Exhibits 2 and 7 (two Inmate Grievance Forms Arrington submitted to the jail relevant to the December 22, 2021 incident).  According to Arrington, he was also unconstitutionally denied access to the courts by jail staff because they retained his seized property for

---

[14] *See Wolfish v. Levi*, 573 F.2d 118, 131-132 n.29 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979); *Bonner v. Coughlin*, 517 F.2d 1311 (7th Cir. 1975), *modified en banc*, 545 F.2d 565 (1976), *cert. denied*, 435 U.S. 932 (1978); *Hansen v. May*, 502 F.2d 728 (9th Cir. 1974); *see also Sostre v. McGinnis*, 442 F.2d 178, 189 (2d Cir. 1971) ("the Constitution protects with special solicitude, a prisoner's access to the courts").

a 14-day period, and "[t]he jail staff is even more at fault" than the Government because they had the "authority" to deny the FBI agents access to his cell.

All the case law cited by Arrington in support of his position that his Fourteenth Amendment procedural due process rights were infringed upon is from the civil realm.  For example, the plaintiff in *Steinberg* was a Bureau of Prisons inmate seeking a writ of habeas corpus alleging that defendants, staff members of the federal correctional institution where he was housed, violated his constitutional and statutory rights by seizing his legal documents from his locker that were later destroyed by the prison.  In *Bonner*, the Seventh Circuit reversed summary judgment entered by the district court and remanded the case for trial because there were triable questions of fact on the prisoner plaintiff's theories about how the defendant prison guards violated his constitutional rights.  The *Bonner* Court concluded this warranted the plaintiff's recovery of damages, after a "shakedown" of his prison cell that resulted in the seizure and loss of his state court transcript.

It is unclear to the Court how any alleged unconstitutional actions taken by jail officials with respect to the seizure of Arrington's documents on December 22, 2021 could be actionable in this forum, and it declines to hold jail officials in contempt of court as requested by Arrington.  Moreover, based on the testimony presented at the hearing, which the Court found to be credible, the consensus of the jail staff is that they were simply assisting the FBI agents to facilitate the Court's Protective Order by permitting them to gather papers from Arrington's cell.

"It is a venerable maxim of constitutional construction that courts should decide no more than is necessary."  *United States v. Ghailani*, 751 F. Supp. 2d 502,

505 n.11 (S.D.N.Y. 2010) (internal quotation marks and citations omitted).  The

Court thus declines to grant Arrington relief sought in relation to the Fourth, Sixth, or

Fourteenth Amendments.[15]  Rather, based on the case law reviewed by the Court,

the Court has determined that any alleged constitutional violation is best analyzed in

this case in terms of a potential Fifth Amendment substantive due process violation.

## II.   **Substantive Due Process Violation, *i.e.*, "Outrageous" Governmental Misconduct**

Arrington moves to dismiss the Superseding Indictment chiefly on substantive

due process grounds.

Preliminarily, Arrington theorizes that the December 22, 2021 incident was

prompted by his filing of a document on the docket on December 21, 2021.[16]  He

deduces that because the Government waited almost a month before effectuating

the Protective Order, the Government must have "raided" his cell in retaliation

against him because it was "very upset about this exposure" of governmental

misconduct.  The Court finds Arrington's theory of retaliation speculative.  It appears

instead—and nothing during the hearing contradicts this—that the delay between

the filing of the Protective Order on November 24, 2021 and the December 22, 2021

jail cell incident stemmed, at least in part, from the unavailability of the FBI agents.

In addition, as explained by Captain Keller, he initially received a copy of the

Protective Order on November 29, 2021 and was asked by the AUSAs to secure the

---

[15] The Court deems it prudent to note that Arrington has commenced a civil lawsuit concerning the subject incident.  *See* 22-CV-06141-FPG.

[16] *See* Docket No. 675 (Arrington's reply on his motion to dismiss on Speedy Trial grounds, which contained an exhibit allegedly proving the Government's misconduct in this case).

protected materials but relayed he did not feel qualified to do so, which is apparently when the AUSAs sought the FBI agents' assistance.

"A defendant can raise a substantive due process claim if outrageous government conduct was directed at him." *United States v. Anderson*, 772 F.3d 969, 974 (2d Cir. 2014), citing *United States v. Salerno*, 481 U.S. 739, 746 (1987) and *Rochin v. California*, 342 U.S. 165, 169 (1952). "Substantive due process 'prevents the government from engaging in conduct that shocks the conscience, or interferes with rights implicit in the concept of ordered liberty." *Salerno*, 481 U.S. at 746 (internal quotation marks and citations omitted). "The Supreme Court limits substantive due process claims to 'deliberate decisions of government officials to deprive a person of life, liberty, or property.'" *Salem v. City of New York*, 811 F. App'x 678, 683 (2d Cir. 2020), quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986). The Second Circuit has further explained, "[s]ubstantive due process is an outer limit on the legitimacy of governmental action . . . Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).

The Second Circuit has also observed that "[t]he dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. Bustos de la Pava*, 268 F.3d 157, 165 (2d Cir. 2001). Specifically, regarding a defendant's motion to dismiss an indictment on substantive due process grounds, the Southern District of New York has explained,

> For a due process violation to result in consequences
> adverse to the government in a criminal case – for
> example, the suppression of evidence or the dismissal of
> an indictment -- there must be a causal connection
> between the violation and the deprivation of the
> defendant's life or liberty threatened by the prosecution.
> That is to say, *relief against the government in a criminal*
> *case is appropriate if, and only if, a conviction otherwise*
> *would be a product of the government misconduct that*
> *violated the Due Process Clause*.  For only in such
> circumstances may it be said that the deprivation of life or
> liberty that follows from a criminal conviction flows from
> the denial of due process.  This conclusion thus rests
> directly on the text of the Due Process Clause itself.

*Ghailani*, 751 F. Supp. 2d at 505, 508 (emphasis added) (holding that "[d]ismissal of

the indictment in the absence of a constitutional violation affecting the fairness of the

criminal adjudication itself [was] unwarranted" where the defendant alleged that he

had been tortured by the Central Intelligence Agency, in violation of the Due Process

Clause, while in pretrial custody at the United States naval base at Guantanamo).

Indeed, Arrington's burden on such a motion is high.  "To meet the very heavy

burden of establishing a due process violation to dismiss an indictment for

outrageous governmental misconduct, a defendant must show that the

Government's conduct was so outrageous that common notions of fairness and

decency would be offended were judicial process invoked to obtain a conviction."

*United States v. Walters*, 910 F.3d 11, 27 (2d Cir. 2018) (internal quotation marks

and citations omitted).  "This inquiry turn[s] on whether the governmental conduct,

standing alone, is so offensive that it shocks the conscience . . . [and s]uccessful

motions to dismiss on this ground have [o]rdinarily involved coercion or a violation of

the defendant's person . . . [a]bsent such extreme misconduct, relief in the form of

reversal of a conviction is rare." *Id.* at 27-28 (collecting cases) (internal quotation marks and citations omitted).  "Where there is a constitutional violation, relief must be tailored to the circumstances in order to safeguard the defendant's rights to counsel and a fair trial, and dismissal is appropriate only where necessary to restore the defendant to the circumstances that would have existed had there been no constitutional error." *United States v. Bonventre*, No. S2 10 Cr. 228 (LTS), 2011 WL 1197853, 2011 U.S. Dist. LEXIS 35360, *8 (S.D.N.Y. Mar. 30, 2011) (internal quotation marks and citations omitted).

Arrington argues that dismissal is appropriate because, among other reasons, the Protective Order only "authorized" him to "hand over" the materials covered by the Protective Order.  He contends that instead of the "raid" by the FBI, jail officials should have instead simply asked him "in good faith to hand over these materials," and if he refused, the Government should have then asked the Court to enforce the Protective Order by, for example, holding Arrington in contempt of Court.

The Protective Order could be read as placing the impetus on Arrington to relinquish protected materials to jail staff.  According to Arrington, he attempted to do so but jail staff declined to accept them from him, and there was testimony from jail officials at the due process hearing to that effect.  Mr. Singer also testified that Arrington had told him he had segregated the documents and was prepared to turn them over, and Mr. Singer conveyed this point to AUSA Lenihan and the jail staff.

The Protective Order does not mention "FBI agents" or any other individuals effectuating the Order.  However, as written, it could also reasonably be read as permitting individuals other than Arrington to ensure that protected materials are

32

dealt with in accordance with the Order.  Indeed, while Arrington attempted to hand over what he believed to be protected materials, the testimony at the hearing established why jail officials were hesitant to take those papers from him and why they would not necessarily take Arrington at his word that he was turning over all the applicable papers.

In its papers, the Government does not explain why it did not approach the Court when AUSA Lenihan learned that jail officials felt they could not effectuate the Protective Order themselves, to determine what next steps would be most appropriate.  Rather, the Government decided that using FBI agents to seize the material was the best way to go about this situation.  According to Mr. Singer's testimony, he was completely unaware of this plan until December 22, 2021, when the AUSAs called him on the phone and the FBI agents were only 30 minutes from the jail, and the AUSAs were not amenable to rescheduling so that Mr. Singer could be present when Arrington's cell was searched.

The Court concludes that Mr. Singer acted with utmost professionalism in protecting the rights of Arrington, while Arrington was acting as his own attorney and in a *pro se* capacity at the time.  Mr. Singer was clearly concerned, and rightly so, about potential disclosure of Arrington's attorney-work product, and suggested a prudent approach to the circumstances he was presented with.  In other words, Mr. Singer demonstrated competence, and his years of experience were reflected in his response to an unanticipated and rapidly unfolding situation.

The Court concludes that the Government's conduct, while not ideal, did not amount to "outrageous governmental misconduct" warranting dismissal of the

Superseding Indictment.  It did not rise to the level of cases where, for example, the defendant's stomach contents were forcibly extracted, or a "confession [was] obtained after six days of custodial interrogation" or by "brutality and violence." *Walters*, 910 F.3d at 27-28.  It evident from the credible testimony at the hearing that the motivation for the Government's actions was to make sure the Protective Order was enforced—contrary to the "investigative motive" that Arrington asserted during oral argument was the driving force behind the Government's actions.

Moreover, the Court is satisfied that the hearing testimony and video evidence more than adequately established the "chain-of-custody" of the documents taken from Arrington's cell on December 22, 2021 to the present, and that neither FBI agents nor jail staff retained those papers, aside from Captain Keller temporarily maintaining them in his private office for the anticipated review by Mr. Singer, and then keeping them in the jail's classroom for Arrington's supervised review.

The evidence has also assuaged any concerns of the Court that Arrington's privileged attorney work product, *i.e.*, the content of his papers, was improperly reviewed.  The FBI agents and Captain Keller testified explicitly that at no time did they read his papers, other than perhaps glancing at cover pages with phrases like "Grand Jury" or taking note of the fact that handwritten notes were on them.

As referenced previously, although the video from December 22, 2021 does not capture the interior of Arrington's jail cell, the Court concludes that, based on the volume of paper the FBI agents carried out of the cell and the short timeframe in which this search and seizure occurred, the FBI agents could not have plausibly

34

conducted any substantive review of Arrington's work product.  This conclusion coalesces with testimony from the FBI agents and Captain Keller.

Of course, if the Court was to later learn that some impropriety occurred in this regard, or that the Government actually retained any of the documents from Arrington's cell to advance its prosecution or for use at trial, a question of at least suppression would arise.  But taken together, the Court is satisfied based on the evidence that Arrington's work product was protected, and that Arrington's substantive due process rights were not violated.

Arrington additionally argues that was unable to file the bail application the Court indicated at the December 16, 2021 status conference he could file, because he had his legal materials taken away from him.  *See* Dkt. No. 674 (CM/ECF Minute Entry, 12/16/2021).  He also asserts that at least for a period he was unable to move forward with his trial preparation, including with the private investigator he hired with Court-allotted funds under the Criminal Justice Act.

In his reply papers, Arrington concedes that he regained access to his legal materials approximately two weeks after December 22, 2021.  It is apparent from the hearing testimony that Mr. Singer was unavailable to review Arrington's documents until then.  The Court concludes that the two-week duration when Arrington could not access his legal papers does not amount to "conduct that shocks the conscience" rendering dismissal appropriate, considering the circumstances here.

The Court made clear at the December 16, 2021 status conference that Arrington could file an application for bail at any time.  Arrington filed a bail motion after that date with a related Fifth Amendment due process motion to dismiss based

on the length of his pretrial detention.  The motion was fully briefed (Dkt. Nos. 702,

708, 728, 729; *see* 701, 715, and 720 [character letters]), and the Court heard oral

argument on Arrington's bail motion on May 25, 2022.  The Court denied the motion

on July 8, 2022 (Dkt. No. 737), and Arrington has since appealed that ruling (*see*

Dkt. No. 748 [Notice of Appeal]; Second Circuit Docket # 22-1581).

 The Court has reviewed Arrington's remaining arguments and concludes that

they are either without merit or warrant no further discussion.[17]

 Last, the Court notes that it has reviewed *United States v. Stein*, 495 F. Supp.

2d 390 (S.D.N.Y. 2007), relied upon by Arrington in support of dismissal, and finds

that it is readily factually distinguishable as it is a case with "singular facts".  *United*

*States v. Gumaer*, 18-330-cr, 2019 U.S. App. LEXIS 11702, *15-17 (2d Cir. Apr. 19,

2019) (amended summary order); *see United States v. Kolfage*, 537 F. Supp. 3d

559, 565 (S.D.N.Y. 2021) (" '[S]ince the Second Circuit decided *Stein* nearly

[thirteen] years ago, no court appears to have relied on the case to find a Sixth

Amendment violation.' "), quoting *United States v. Fisher*, 273 F. Supp. 3d 354, 362

---

[17] Arrington argues that the Government's "interest" in enforcing the Protective Order "is being used by the [G]overnment for tactical advantages over [Arrington] to impair his defense before trial, and to limit his ability to have access to the evidence and materials for preparation for trial."  He also complains about the way the Protective Order is drafted, in that according to him, it is "hindering" his ability to prepare for trial. Arrington argues the Protective Order is not necessary (and again, brings up the alleged "misconduct" that occurred during the grand jury proceedings in this case, which were already dispensed with in the Court's prior Decision and Order on the parties' numerous pretrial motions).  Specifically, Arrington argues that on the weekends he is not permitted to access his legal materials because the "jail classroom is locked" and he is not allowed to bring his notes or paperwork there to compare certain documents, or "to his cell for further analysis."  He also argues that the jail staff are now giving him a difficult time after every visit to the classroom where his legal materials are being stored, stripping him down naked to search him and see if he is taking anything back to his cell (including having him bend over for a cavity search), which is "very humiliating" to Arrington and in further violation of his Fourth Amendment rights.

(W.D.N.Y. 2017); *Bonventre*, 2011 U.S. Dist. LEXIS 35360, at *9-18.  No extended

discussion of Arrington's misplaced reliance on *Stein* is necessary.

## **CONCLUSION**

For the reasons set forth herein, Arrington's motion (Dkt. Nos. 679, 694) to

dismiss the Superseding Indictment for an alleged violation of his due process rights

is DENIED.

Jury selection is currently scheduled for September 27, 2022; the Court

hereby moves jury selection to September 7, 2022 at 9:30 a.m.  Trial will begin after

jury selection and continue day-to-day until completed.  A final pretrial conference

will be held on September 1, 2022 at 2:00 p.m.  The Court will issue a Final Pretrial

Order following the docketing of this Decision and Order with instructions for pretrial

submissions.  No further motions will be considered by the Court, other than motions

filed in accordance with the schedule set forth in the Final Pretrial Order.[18]


**SO ORDERED.**


                                          *s/Richard J. Arcara*
                                          HONORABLE RICHARD J. ARCARA
                                          UNITED STATES DISTRICT COURT

Dated:   August 10, 2022
         Buffalo, New York

---

[18] The only pending motion on the docket is Arrington's motion (Dkt. No. 705) for reconsideration of the Court's denial of his motion pursuant to Fed. R. Crim. P. 6, regarding disclosure of grand jury materials. That motion will be decided in due course.